FEB 1 0 2012

CLERK US
ALEXA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:11cr577 |
| | ) | |
| THOMAS WALKER SINGLETON, JR. | ) | |
| a/k/a Black, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Following a traffic stop and a subsequent search of the vehicle in which he was a passenger, defendant Thomas Walker Singleton, Jr. ("Singleton") was arrested and charged with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). By pretrial motion, defendant sought to suppress certain statements and physical evidence, including the firearm, on the ground that the traffic stop was unlawfully extended beyond its constitutionally permissible purpose. Following an evidentiary hearing on February 3, 2012, defendant's motion to suppress was taken under advisement. *See United States v. Singleton*, Criminal No. 1:11cr577 (E.D. Va. Feb. 3, 2012) (Order). For the reasons that follow, defendant's motion to suppress must be denied.

### I.[1]

The record reflects that on September 4, 2008, Singleton waived his right to a formal indictment and pled guilty in the Eastern District of Virginia to a one-count criminal information charging him with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). *See United States v. Singleton*, 1:08cr339 (E.D. Va. Sept. 4, 2008) (Plea

---

[1] The facts recited here are the Court's findings of fact pursuant to Rule 12, Fed. R. Crim. P.

1

Agreement). On November 21, 2008, Singleton was sentenced on this offense to the mandatory minimum term of imprisonment of 60 months, to be followed by three years of supervised release. Singleton's custody sentence was later reduced to 36 months, pursuant to Rule 35, Fed. R. Crim. P., and he began serving his three-year term of supervised release on January 25, 2011.

On September 21, 2011, nine months into his period of supervised release, Singleton was a rear seat passenger in a vehicle that was stopped for a traffic violation. On that date, Sergeant John Davis of the Loudoun County Sheriff's Office was conducting routine patrol in his police cruiser in Ashburn, Virginia. Shortly after 7:00 p.m., Sergeant Davis observed a silver Chevrolet Malibu traveling in the Ashburn Village area with window tint that appeared to be darker than the legal limit.[2] Sergeant Davis also observed that the vehicle's driver side rear brake light was not functioning.[3] Based on these observations, Sergeant Davis contacted dispatch using the radio in his police cruiser to report his location, the observed vehicle's tag number, and the fact that he planned to initiate a traffic stop. Dispatch records reflect that this call took place at 7:13 p.m. Approximately one minute later, when Sergeant Davis approached "a safe location to stop," he activated his emergency lights and proceeded to pull the Chevrolet Malibu over on Gloucester Parkway, just west of Rainsboro Drive in Ashburn, Virginia. Transcript of 2/3/12 Hearing

---

[2] *See* Va. Code § 46.2-1052(C)(1) (providing that "[n]o sun-shading or tinting films may be applied or affixed to the rear side windows or rear window or windows of any motor vehicle operated on the highways of this Commonwealth that reduce the total light transmittance of such window to less than 35 percent "); Va. Code § 46.2-1052(C)(2) (providing that "[n]o sun-shading or tinting films may be applied or affixed to the front side windows of any motor vehicle operated on the highways of this Commonwealth that reduce total light transmittance of such window to less than 50 percent").

[3] *See* Va. Code § 46.2-1014 (providing that "[e]very motor vehicle . . . registered in the Commonwealth and operated on the highways in the Commonwealth shall be equipped with at least two brake lights . . . [that] shall automatically exhibit a red or amber light plainly visible in clear weather from a distance of 500 feet to the rear of such vehicle when the brake is applied").

(hereinafter "Tr.") at 33.  Accordingly, the actual traffic stop — and thus the "seizure" of the vehicle's driver and its occupants for purposes of the Fourth Amendment — commenced at 7:14 p.m.  Tr. at 31-32.

After the vehicles were stopped, Sergeant Davis exited his police cruiser and approached the driver's side of the Chevrolet Malibu.  By the time he reached the vehicle, the driver — a female — had already rolled down the driver's side front window.  Sergeant Davis advised the driver that he had stopped the vehicle because of its darkened window tint.  He observed one passenger sitting in the front passenger seat, but was unable to see into the back of the vehicle.  He therefore asked the driver to roll down the driver's side rear window, both so that he could test that window with a tint meter and also so that he could see inside the vehicle.  Sergeant Davis also asked the driver for her driver's license and vehicle registration, and she promptly complied with Sergeant Davis's requests.

As the driver began to roll down the driver's side rear window, Sergeant Davis was "startled" to see a second passenger — later identified as Singleton — seated behind the front passenger seat, but leaning across the back seat and reaching down toward the floorboard behind the driver's seat.  Tr. at 35.  Then, once the driver's side rear window had been rolled down about halfway, Sergeant Davis observed Singleton pull his hand back from the area behind the driver's seat.  Tr. at 11, 35.  At that point, Singleton — without any questioning or provocation on the part of Sergeant Davis — blurted out several times that he was "reaching for his cell phone."  Tr. at 11.  Sergeant Davis then told Singleton to "stop reaching," at which point Singleton "leaned over [to his left] and started looking out the [driver's side rear] window as [Sergeant Davis] was speaking to him."  Tr. at 13.  As he did so, Sergeant Davis observed that Singleton's left hand "again went towards the floorboard behind the driver's seat."  Tr. at 12; *see also* Tr. at 13 ("I

3

noticed that his hand went down towards the floorboard area of the car, behind the driver's seat.").

Sergeant Davis then told Singleton, for the second time, to "stop reaching" and "[j]ust sit up."  Tr.

at 14.

Based on Singleton's "odd" behavior, Sergeant Davis suspected that Singleton was

"attempting to hide something in the vehicle" and he "figured it was some sort of contraband."

Tr. at 14, 15, 16.  On this issue, Sergeant Davis specifically testified as follows:

> It was my impression that he was attempting to hide something in
> the vehicle. . . [A]fter I told him initially not to reach, he again
> reached down towards that area.  His -- his reaction was odd.  It
> wasn't something that I would typically see . . . His response, "I was
> just reaching for my phone.  I was just reaching for my phone,"
> after it appeared in my opinion that he was caught doing something.
> That was my impression of his response.  And then again, after I
> told him not to reach down there, he did again reach.

Tr. at 14.  In reaching the impression that Singleton was attempting to hide something inside the

vehicle, Sergeant Davis relied on his "training and experience of ten years."[4]  Tr. at 15.  In this

regard, he testified that he has conducted "numerous traffic stops where [he] witnessed people

hiding contraband."  Tr. at 15.  He further testified that "[t]hat's typically what people would do,

[he] ha[s] found, is try to hide something that they are not legally allowed to have." Tr. at 16.

As it happens, Sergeant Davis did not then verbalize his suspicion that Singleton was

attempting to hide something inside the vehicle; nor did Sergeant Davis, at that time, ask the driver

or any of the vehicle's occupants any questions pertaining to drugs or weapons.  Instead, Sergeant

Davis continued to speak to the vehicle's driver about the purpose of the initial stop and proceeded

---

[4]  Sergeant Davis has been employed by the Loudoun County Sheriff's Office for more than ten
years.  The record reflects that he has extensive experience in conducting traffic stops and has
participated in more than one hundred stops during the course of which he determined that one of
the vehicle's occupants was attempting to hide something from law enforcement, typically drugs
or other contraband.

4

to test the window tint on the driver's side windows.  The tint meter revealed that the vehicle's rear driver's side window allowed only 15 percent of total light transmittance and the front window allowed only 12 percent, both clearly illegally tinter under the applicable Virginia statute. *See supra* note 2.  Sergeant Davis then asked the driver whether she had ever received any prior warnings concerning the vehicle's tinted windows, and she responded that she had not.  He also asked her whether she had previously been cited for not having an appropriate county decal affixed to the vehicle — something Sergeant Davis had observed during the course of the traffic stop. The driver indicated that she had received such a citation, but that she did not have the citation with her at that time.

By then, it was 7:18 p.m. and only four minutes had elapsed since the vehicle had been pulled over.  At that time, Sergeant Davis walked back to his police cruiser with the driver's vehicle registration and driver's license.   As he was walking, he used his shoulder radio to call for a back-up unit and a K-9 officer; he did this, as he put it, as a result of Singleton's "disturbing" behavior.  Tr. at 17.  Police dispatch records confirm that a K-9 officer was contacted and dispatched to the scene one minute later, at 7:19 p.m.

Once he was back inside his police cruiser, Sergeant Davis proceeded to run the standard computer checks on the driver's vehicle registration and driver's license.  Tr. at 18.  He also checked to see if either the driver or the vehicle had been involved in any prior encounters with law enforcement.  *Id.*  While Sergeant Davis was conducting these standard checks, the back-up officer arrived on scene.  Dispatch records reveal that this occurred at 7:26 p.m., 12 minutes after the vehicle was stopped.

Sergeant Davis remained in his cruiser, but took a moment to explain to the back-up officer "what had been happening with the vehicle, [and] how the passenger in the back seat was

5

reaching." Tr. at 18. He then asked the back-up officer to test the passenger's side windows using Sergeant Davis's tint meter and, while doing so, to "see if he could see anything in the car that [Singleton] may have been trying to hide." Tr. at 19. In all, Sergeant Davis's interactions with the back-up officer took "about a minute or two." Tr. at 21. At around this same time, Sergeant Davis also spoke on his Department-issued Blackberry to the K-9 officer, who had called Sergeant Davis while he (the K-9 officer) was driving to the scene from "the east end of the county, known as Sterling, Virginia." Tr. at 49. That telephone call lasted approximately "forty-five seconds," during which time Sergeant Davis explained to the K-9 officer "the same thing [he] explained to the backup officer, just the actions of the passenger, Mr. Singleton." Tr. at 21.

Still in his police cruiser, Sergeant Davis proceeded to fill out the summonses to be issued to the driver. While doing so, he spent a bit more time "watching the vehicle," as compared to other traffic stops, not only because of Singleton's "odd" and "disturbing" behavior, but also "due to the darkness of the windows" and the fact that he could not see inside the vehicle to see what the occupants were doing. Tr. at 19. Once he completed the paperwork, Sergeant Davis exited his cruiser and walked back to the driver's side of the stopped vehicle. He asked the driver to exit the vehicle so that he could both explain the citations to the driver, and also show her the defective equipment on the vehicle, in this case, show her which brake light was not functioning and demonstrate how he could not see through the tinted windows. Tr. at 22, 39-41.[5] Significantly, Sergeant Davis testified that this is his standard practice for traffic stops. He explained that he

---

[5] Specifically, Sergeant Davis testified that he "wanted to show her which brake light it was; as well [he] wanted to show her the tint and how it was so dark that [he] could not see through it, and let her know that that's illegal." Tr. at 41.

routinely takes these actions, when it is safe to do so, "so [the driver] would have an idea of what was going on." Tr. at 22.[6] And, in this instance, in addition to following his standard practice, Sergeant Davis also wanted to ask the driver — outside the presence of Singleton and the other passenger — what Singleton had been reaching for inside the vehicle. *See* Tr. at 41 ("I also wanted to talk to her about the passenger, away from the passenger").

Once the driver had exited the vehicle, Sergeant Davis began to show her the defective vehicle equipment. He also engaged in a brief conversation with the driver at the rear of the vehicle — approximately "45 seconds to a minute"— which he summarized as follows:

> I basically just asked her -- I asked her what Mr. Singleton was reaching for. She stated she did not know. I asked her if there was [sic] any weapons in the car. She said no. I asked her if there was [sic] any narcotics. She said no. I then asked her if I could search the vehicle. And she said, "Well, I'm in a hurry."

Tr. at 22-23, 25. According to Sergeant Davis, he asked the driver these questions "intermixed" and at "the same time" as showing her the defective vehicle equipment. Tr. at 42. In other words, "while she was looking at the things and saying she was going to fix them, [he] was asking her the other questions." Tr. at 43. Sergeant Davis further testified that he asked the driver whether there were any narcotics in the vehicle, in particular, because "of the actions of Mr. Singleton," and because he "believed [Singleton] was trying to hide something illegal." Tr. at 45.

At 7:33 p.m. — 19 minutes after the vehicle had been stopped — the K-9 officer, Deputy Sheriff Christopher Coderre, arrived on scene with his German Shepherd, Gero. The dog immediately started to bark once Deputy Coderre stopped his vehicle. At that time, Sergeant

---

[6] In this regard, Sergeant Davis testified that "typically [he] will have the people, if it's an equipment violation, just to make sure they understand what's wrong, I will point it out so they know and they can get it fixed." Tr. at 41. Similarly, he testified that "[t]ypically . . . if something is wrong in the back of the car, a window tint, if it's in a safe location [he] will pull someone out just to show them, or if they ask [him] to show them what's wrong." *Id.*

Davis was still standing at the rear of the Chevrolet Malibu with the female driver, and he had not yet (i) explained or issued the citation forms to her, (ii) asked her to sign the summonses, or (iii) returned her driver's license, which remained on his clipboard. Before taking any of these actions — all of which are necessary and standard procedures for traffic stops — Sergeant Davis advised the driver that he wanted to have the dog walk the perimeter of the vehicle. He also advised her that if she had "anything inside the car," she should "just be honest" with him. Tr. at 23. In response, the driver admitted to Sergeant Davis that she had a small amount of marijuana in her change purse. According to Sergeant Davis, a total of "18 to 19 minutes" had elapsed from the time he stopped the vehicle to the time the driver admitted to possessing marijuana. Tr. at 25.

Following the driver's admission, Singleton and the other passenger were asked to step outside the vehicle so that Deputy Coderre could perform a vehicle sweep with his dog. Not surprisingly, the dog "alerted" positively for the presence of drugs inside the vehicle. Sergeant Davis and Deputy Coderre then proceeded to search the vehicle, in the course of which they discovered a revolver in the glove compartment, which, according to Sergeant Davis, had not previously been there when the driver had retrieved her registration from the glove compartment earlier in the stop. Also discovered inside the vehicle was a small jewelry box containing a few marijuana "roaches or blunts," as well as the small amount of marijuana that the driver had admitted was inside her change purse.

Later that evening, both the driver and the other passenger of the vehicle told Sergeant Davis that Singleton had brought the revolver into the vehicle. Following further investigation, Singleton was arrested and charged with being a felon in possession of a firearm, in violation of 18

U.S.C. § 922(g)(1).[7]  In a pretrial motion to suppress, Singleton argues that Sergeant Davis unlawfully extended or prolonged the traffic stop beyond its constitutionally permissible purpose. Put simply, Singleton argues that once Sergeant Davis had finished filling out the citations for the driver and then walked back to the vehicle with the citations in hand, the lawful purpose of the vehicle stop was complete.  Singleton thus argues that everything that occurred after that point — including the driver's admission of marijuana possession, the K-9 inspection, the search of the vehicle revealing the firearm in the glove compartment, and any subsequent statements made by the vehicle's occupants — was tainted by the unconstitutional extension of the stop and must be suppressed as "fruit of the poisonous tree."

An evidentiary hearing was held on February 3, 2012, at which the government presented the testimony of Sergeant Davis and Deputy Coderre.  Defendant, by counsel, cross-examined the government's witnesses extensively, but declined the opportunity to present any additional testimony.  At the conclusion of the hearing, the matter was taken under advisement.  *See United States v. Singleton*, 1:11cr577 (E.D. Va. Feb. 3, 2012) (Order).  Defendant's motion to suppress is now ripe for disposition and, for the reasons that follow, it must be denied.

---

[7]  Although the record is not entirely clear on this point, it appears that Singleton, after he was arrested and read his *Miranda* rights, admitted to Sergeant Davis that he brought the firearm into the vehicle.  Tr. at 27.  Yet, Singleton claimed that he did so only because the firearm belonged to the other passenger in the vehicle, and the other passenger had previously left the firearm in his (Singleton's) house.  *Id.*  A subsequent search of Singleton's cell phone contradicted this statement, revealing two pertinent text messages that had been sent by Singleton to two different individuals.  Both messages included a photograph of the subject firearm, and one included the caption, "my new throw-away," while the other stated words to the effect of, "It's not much, but it's better than nothing."  Tr. at 28-29.

## II.

It is important to note, at the outset, that Singleton does not dispute the constitutionality of the initial traffic stop, or "seizure," in this instance.[8]  Indeed, Singleton correctly concedes that the vehicle's darkened window tint and broken rear brake light gave Sergeant Davis sufficient cause to initiate a traffic stop and to issue summonses to the vehicle's driver for violating the applicable Virginia statutes, *see supra* notes 2 & 3.[9]  Instead, what Singleton argues here is that Sergeant Davis unlawfully prolonged or extended the traffic stop beyond its constitutionally permissible purpose.  A careful examination of the record as a whole confirms that Singleton's argument in this regard must be rejected.

As the Fourth Circuit has recognized, "[t]he maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008).  It is nonetheless clear that observation of a traffic violation, as occurred here, "provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *Id.* at 335 (citation omitted).  For example, the officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir.

---

[8]  It is well-settled that "[w]hen a police officer stops an automobile and detains the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) (citations omitted).

[9]  Traffic stops for observed traffic violations clearly do not violate the Fourth Amendment.  As the Fourth Circuit put it, "[w]hen an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment." *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993) (recognizing that an objective test applies to a traffic stop "however minor" the particular traffic violation in question); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

10

2004). An officer may also request identification and run computer checks on one or more passengers inside the vehicle, if deemed necessary and appropriate "in the interest of personal safety." *See United States v. Soriano-Jarquin*, 492 F.3d 495, 500-01 (4th Cir. 2007).

Significantly, during the course of a routine traffic stop, a law enforcement officer's "questions or actions . . . need not be solely and exclusively focused on the purpose" of the initial stop. *United States v. Mason*, 628 F.3d 123, 131 (4th Cir. 2010). Rather, an officer may "inquir[e] into matters unrelated to the justification for the traffic stop, . . . and may take other actions that do not constitute 'searches' within the meaning of the Fourth Amendment, such as conducting a dog-sniff of the vehicle," provided that those additional actions or inquiries "do not measurably extend the duration of the stop." *United States v. Guijon-Ortiz*, 660 F.3d 757 (4th Cir. 2011) (internal quotation marks and citations omitted).[10] Put differently, the scope of the unrelated questions or actions must not demonstrate that the officer has "definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation;" nor may the unrelated questions or actions "constitute[] the bulk of the interaction" between the officer and the motorists. *United States v. Digiovanni*, 650 F.3d 498, 508-09 (4th Cir. 2011) (internal quotation marks and citation omitted).

Simply put, "a traffic stop must be reasonable both in its scope and duration." *Digiovanni*, 650 F.3d at 509 (citations omitted). The police officer conducting the stop must also "act

---

[10] *See also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (noting that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop") (citation omitted); *Mason*, 628 F.3d at 131 (recognizing that an officer may question motorists about matters unrelated to the purpose of the stop "provided that the unrelated questioning does not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention").

11

reasonably, that is, he must diligently pursue the investigation of the justification for the stop." *Id.* In all cases, "the diligence determination examines the totality of the circumstances." *Id.* And importantly, "where a delay can be characterized as *de minimis* under the totality of the circumstances, it will not be recognized as a Fourth Amendment violation." *Digiovanni*, 650 F.3d at 509 (citations omitted).[11]

These principles, applied here, point persuasively to the conclusion that Sergeant Davis did not unlawfully extend the traffic stop beyond its original purpose — namely, the purpose of investigating and issuing citations to the driver for the illegally tinted windows and broken rear brake light. In this regard, it must first be noted that the original purpose of the traffic stop was not yet complete at the time the driver admitted to possessing marijuana. Indeed, Sergeant Davis had not yet explained or issued the two citations to the driver; nor had he returned to the driver her license or asked her to sign the required summonses. *See, e.g., United States v. Davis*, No. 10-4416, 2011 WL 6826135 at * (4th Cir. Dec. 29, 2011) (noting that "although the officers had finished writing the citation, they had not issued it and therefore had not effectuated the purpose of the stop"). It was also entirely reasonable for Sergeant Davis, before issuing the citations, to ask the driver to exit the vehicle so that he could explain the citations to her and show her the defective vehicle equipment — actions that he testified were among his standard procedures for routine traffic stops. *See, e.g., Davis*, 2011 WL 6826135, at *5 (where Fourth Circuit noted that it was "reasonable and permissible" for an officer to ask a driver "to step out of the vehicle to explain and

---

[11] *See, e.g., United States v. Farrior*, 535 F.3d 210 (4th Cir. 2008) (holding that a "minimal" delay caused by a police officer's inexperience, during which a drug dog arrived and alerted to the presence of drugs, was not unreasonable where there was no attempt at subterfuge or stalling on the part of the police officer); *United States v. Mason*, 628 F.3d 123 (4th Cir. 2010) (holding that unrelated questioning that took "one to one and one-half minutes" was not unreasonable because the traffic stop was conducted "promptly and efficiently").

12

issue the citations" and that such a request "does not suggest a lack of diligence in prosecuting the stop").

Moreover, the fact that Sergeant Davis engaged in actions and inquired briefly into matters unrelated to the original justification for the traffic stop (*i.e.*, those pertaining to Singleton's "odd" and "disturbing" behavior) did not, in this instance, impermissibly extend the stop so as to amount to a Fourth Amendment violation.   To be sure, Sergeant Davis's unrelated actions and questions were neither "extensive" nor "time-consuming;" nor did they constitute "the bulk of the interaction" between Sergeant Davis and the driver.  *Digiovanni*, 650 F.3d at 508-10.   In fact, all of Sergeant Davis's unrelated questions and actions, combined, totaled no more than two to three of the 19 minutes that elapsed from the time the vehicle was stopped to the time the driver admitted to possessing marijuana.   It is also clear from the record that Sergeant Davis did not, at any time, "definitively abandon[] the prosecution of the traffic stop and embark[] on another sustained course of action."  *Id.*   Rather, he acted diligently, and reasonably, to effectuate the original purpose of the stop, right up until the moment the driver admitted to possessing marijuana.[12]

In sum, then, the traffic stop in this instance was reasonable in both scope and duration and was not unlawfully extended beyond its original purpose.   Singleton's motion to suppress must

---

[12]   Of course, once the driver made this admission, Sergeant Davis then had probable cause not only to extend the duration of the vehicle stop, but also to conduct a warrantless search of the driver's vehicle.   It is well-settled that the Fourth Amendment permits warrantless searches under the "automobile exception," which teaches that "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment...permits police to search the vehicle without more."  *Maryland v. Dyson*, 527 U.S. 465, 466 (1999).   And, if such probable cause exists to search a particular vehicle under the automobile exception, the authority to search likewise extends to warrantless searches of any containers or compartments located inside the vehicle.  *See Wyoming v. Houghton*, 526 U.S. 295 (1999); *California v. Acevedo*, 500 U.S. 565 (1991); *United States v. Bullock*, 94 F.3d 898, 899 (4th Cir. 1996).   It is also important to reiterate that the search that occurred here was not merely a search incident to an arrest, such as the one involved in *Arizona v. Gant*, 556 U.S. 332 (2009), but rather was a search for contraband pursuant to probable cause.

therefore be denied on this ground.

### III.

But the analysis need not end here, for it should also be noted that even assuming Sergeant Davis had prolonged the traffic stop beyond the scope of its original purpose, the resulting brief delay was nonetheless justified given Sergeant Davis's reasonable suspicion that Singleton was engaged in additional criminal activity.

It is well-established that a police officer may extend the detention of a vehicle's driver and its occupants beyond the scope of a routine traffic stop if the officer has a "reasonable suspicion" of additional criminal activity. *Branch*, 537 F.3d at 336 (citations omitted). To satisfy the reasonable suspicion requirement, a police officer "must simply point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.*[13] For purposes of this analysis, district courts must evaluate the totality of the circumstances, giving "due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004) (citation omitted). In other words, "[j]udicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *Branch*, 527 F.3d at 337.

The facts of this case fall squarely within these well-established reasonable suspicion principles. As previously noted, Sergeant Davis observed Singleton engage in "specific and articulable" actions that led him <u>instantly</u> to suspect that Singleton was attempting to hide some

---

[13] *See also Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (defining "reasonable suspicion" as something "more than inchoate and unparticularized suspicion or hunch of criminal activity," but "less . . . than probable cause").

form of contraband inside the vehicle. Indeed, based on Singleton's "odd" and "disturbing" behavior, Sergeant Davis contacted dispatch only four minutes into the vehicle stop to request a backup officer and a K-9 unit. Tr. at 17. And significantly, Sergeant Davis's belief that Singleton was engaged in additional criminal activity was based not only on his ten years of training and experience in law enforcement, but also on his personal involvement in more than one hundred vehicle stops in which a driver or passenger had engaged in similar actions in an effort to hide some form of contraband from law enforcement. In the circumstances presented here, Sergeant Davis clearly had "more than an inchoate and unparticularized suspicion or hunch of criminal activity" on the part of Singleton. *Branch*, 537 F.3d at 336. Rather, he had a reasonable and articulable suspicion of such criminal activity and his actions were in all respects consistent with the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968).

### IV.

In sum, then, Singleton's motion to suppress must be denied not only because the traffic stop was not unlawfully extended beyond its original purpose, but also because Sergeant Davis had a reasonable suspicion to believe that Singleton was engaged in additional criminal activity.

An appropriate Order will issue.

Alexandria, VA
February 10, 2012

T. S. Ellis, III
United States District Judge

15